FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                              :
UNITED STATES OF AMERICA,                     :     06 CR 98 (ARR)
                                              :
                                              :     NOT FOR PRINT
        -against-                             :     PUBLICATION
                                              :
                                              :     OPINION AND ORDER
NESTOR NAJERA-TREJO,                          :
                                              :
                Defendant.                    :
                                              :
------------------------------------------------------------- X

ROSS, United States District Judge:

Defendant Nestor Najera-Trejo ("defendant" or "Najera-Trejo") was indicted for the crime of illegal reentry following deportation, in violation of 8 U.S.C. § 1326(a), on February 16, 2006. By motion dated June 14, 2006, defendant moves to dismiss the indictment pursuant to 8 U.S.C. § 1326(d) by collaterally attacking his removal order on the basis of a fundamental procedural error in his October 1996 removal hearing. For the reasons stated below, the court grants defendant's motion to dismiss the indictment.

## BACKGROUND

Defendant was born on January 1, 1978 in Honduras. (See Hr'g Tr. 13, 31.) Miriam Riviera, defendant's mother, moved to the United States in 1980 or 1981 at the age of twenty. (Id. at 13.) She left defendant, who was three years old at the time, and his younger brother, Christian, in Honduras in the care of her parents. (Id. at 13-14.) Her father has since passed away, and her mother is now eighty-six years old. (Id. at 14.) Once in the United States, Mrs. Riviera moved to Brooklyn, New York and has lived in the Sunset Park neighborhood of

1

Brooklyn for the past twenty years. (Id. at 13.) Mrs. Riviera remarried to Gilberto Riviera and had two more children, Carolina and Gilberto, Jr. (Id. at 15.) On March 19, 1989, based on Mrs. Riviera's successful petition to the Immigration and Naturalization Service ("INS"), defendant and Christian came to live with their mother in Brooklyn as lawful permanent residents of the United States. (See id. at 15, 26.) Mrs. Riviera believed that she was reuniting her family by bringing defendant and Christian to Brooklyn. (Id. at 16.)

With the exception of defendant, all the members of defendant's immediate family are United States citizens. Mr. Riviera, Carolina, and Gilberto, Jr., are United States citizens because they were born in the United States. (See Hr'g Tr. at 16-17.) Mrs. Riviera became a naturalized citizen on June 14, 1996, and Christian has derivative citizenship through his mother. (See id. at 16.) At the hearing, Mrs. Riviera testified that she could not include defendant in her application for citizenship because he was over the age of sixteen at the time of the application. (Id.) In addition to his immediate family, defendant's extended family—including his aunt, uncle, and cousins—are United States citizens and also live in Brooklyn. (Id. at 17.) Defendant's birth father, who abandoned Mrs. Riviera and has not communicated with her since, lives in Florida and is a United States citizen. (Id. at 18.)

When defendant moved to Brooklyn, he attended New York City public school. (Hr'g Tr. 18.) While he was supposed to start in second grade, he passed a test allowing him begin third grade at P.S. 94. (Id. at 18-19.) He was enrolled in a bilingual class because he could not speak English initially. (Id. at 18.) After six months in the bilingual class, he could speak English well and was integrated into the English-speaking classes. (Id. at 18-19.) After

defendant graduated from grammar school at P.S. 94, he attended middle school at Pershing Junior High. (Id. at 19.)

As a child, defendant worked after school as a delivery boy at a supermarket located across the street from his school. (Hr'g Tr. at 20, 26.) Defendant wanted to work to buy himself clothes and make money to help his family. (Id. at 20, 35.) Mrs. Riviera has worked as a seamstress her entire life, and her husband works two jobs in maintenance. (Id.) Mrs. Riviera testified that they are a "simple family" and only spend money on the things that they need. (Id.) Defendant had also told his mother that he wanted to work to help his grandmother in Honduras because she was sick at the time. (Id.) In addition to his job at the supermarket, defendant assisted his stepfather in his maintenance work and also helped his neighbors shovel snow during the winter. (Id. at 21, 35.)

Defendant also began volunteering at a local church above the supermarket called the Carismatico House of Prayer. (Hr'g Tr. at 3-4, 6-7.) In the summer of 1991, Pastor Carmelo Velasquez met defendant for the first time when defendant was assisting church members in the construction of the church's new building on Sixth Avenue. (Id. at 4.) Defendant helped the construction effort by breaking cement and bringing in wood. (Id.) Defendant joined the church that same year and subsequently was baptized in the church. (Id. at 5.) As a member of the church, defendant participated in youth retreats and attended services three times a week: the youth service on Tuesday, the regular service on Thursday, and the evangelical service on Sunday. (Id.) In addition to simply observing the services, at times, defendant would testify at services by announcing to the congregation that being part of the church caused him great joy. (Id.) At the hearing, Pastor Velasquez testified that he believed that "[defendant] was a very

respectful, obedient ... [and] good boy at that time" and that his congregation shared that view of him. (Id. at 5-6.)

Defendant joined the Carismatico House of Prayer on his own. (See Hr'g Tr. 9.) Defendant's mother only rarely joined him at church services because she is Catholic. (Id.) At the hearing, Mrs. Riviera explained that she and her mother, defendant's grandmother, have different religions: defendant's grandmother is Christian, while Mrs. Riviera joined the Catholic Church at a young age. (Id. at 25.) While raised by his grandmother in Honduras, defendant adopted her religion. (Id.) When defendant came to the United States, Mrs. Riviera permitted defendant to go to the church of his own choosing "because it's his decision" and "[she] respect[s] that." (Id. at 26.)

In addition to working and attending church, defendant was also a member of the Boy Scouts for two years. (Hr'g Tr. 21, 35.) Defendant regularly attended Boy Scout meetings and also went on camping trips with his troop. (Id. at 22, 36.) At the hearing, defendant stated that his fondest memory from his Boy Scout experience was receiving an award for finding another troop member who got lost on a camping trip. (Id. at 35-36.)

When defendant was in the eighth grade, his mother took him for counseling due to her concerns that he was disobeying her and associating with the "wrong persons." (Hr'g Tr. at 22.) On September 14, 1994, defendant, who was sixteen at the time, was arrested for carjacking. (See id. at 39-40; see also Gov't Brief Ex. A at 197-226.) He was charged with one count of robbery in the first degree, two counts of robbery in the second degree, one count of unauthorized use of a vehicle, two counts of grand larceny in the fourth degree, one count of criminal mischief in the third degree, and one count of criminal possession of stolen property in the fourth degree.

4

(See Gov't Brief Ex. A at 197-226.) At the hearing, defendant testified that he had smoked marijuana just prior to the robbery with his friend at the time, Julio. (Hr'g Tr. 39-40.) He and Julio decided to steal a car to go for a joy ride. (Id. at 40.) Defendant hit the driver of the car with a stapler, and Julio drove the car while he sat in the backseat. (Id.) Defendant pled guilty to all the charges against him. (Id.) On January 3, 1995, defendant was convicted of all charges and sentenced concurrently for an effective term of incarceration of two-to-six years. (See id.; see also Gov't Brief Ex. A at 99.)

Defendant served his sentence in Ulster Correctional Facility. Prior to his deportation hearing, defendant participated in several positive programs, including Hispanics in Progress and Alternatives to Violence. (Hr'g Tr. 45-46.) In addition, defendant took classes to complete his GED. (Id. at 46.) However, defendant was also cited for several disciplinary violations prior to his deportation hearing,[1] including disobeying a direct order, fighting, and creating a disturbance. (See Gov't Hr'g Ex. 1.)

On July 12, 1996, the INS commenced deportation proceedings against defendant on the basis of his criminal convictions. (Gov't Brief Ex. A at 81-86.) On September 12, 1996, defendant appeared pro se before Immigration Judge ("IJ") Joe Miller and was granted an adjournment to find an attorney to represent him. (Def. Brief Ex. F at 20-23.) On October 10, 1996, defendant appeared before the IJ for his deportation hearing with counsel, Marianthe Poulianos, Esq. (Gov't Brief Ex. A at 24.) According to defendant, Ms. Poulianos only met with

---

[1] Defendant was also cited for violent conduct for an incident that occurred on February 11, 1997. (See Gov't Hr'g Ex. 1.) Given that the incident occurred after his deportation hearing and after his final order of deportation was issued, the court will not consider the evidence of defendant's violent disciplinary infraction in its determination.

defendant once and did not have time to talk to him prior to the hearing, nor did she communicate with him thereafter. (Hr'g Tr. 54.) The IJ found defendant deportable under § 241(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA" or "Act") because defendant committed an aggravated felony. (Gov't Brief Ex. A at 27.)

At this point, Ms. Poulianos orally moved for discretionary relief pursuant to § 212(c) of the Act. (Gov't Brief Ex. A at 29.) The INS attorney, Roger Sagerman, argued that the 1996 amendments to the Act eliminated § 212(c) relief for persons charged with aggravated felonies. (Id. at 30.) The IJ agreed with Mr. Sagerman's interpretation and stated that he only held § 212(c) hearings for persons who filed for relief prior to the passage of the amendments. (Id. at 30-31.) The IJ specifically told Ms. Poulianos that "[h]e does not believe [her] client under the AEDPA is eligible for 212(c) at this point." (Id. at 31.) After notifying counsel that she could appeal his decision, the IJ went on to inform counsel that her client may be eligible for relief under § 245 and § 212(h) of the Act, and went on to instruct her on how to apply for relief on those grounds. (Id. at 32-36.) The IJ set a filing date for November 12, 1996 and set a hearing date for January 30, 1997. (Id. at 39.)

Ms. Poulianos failed to file all of the documents necessary for either § 245 or § 212(h) relief, nor did she raise her argument concerning defendant's right to § 212(c) relief. (Gov't Brief Ex. A at 52-53.) As a result, on November 26, 1996, the IJ issued an order of deportation. (Id.) On December 26, 1996, Ms. Poulianos filed a notice of appeal to the Board of Immigration Appeals ("BIA") and also filed a motion to reconsider the deportation order. (Def. Brief Ex. K at 54-58.) Neither of these motions raised the issue of whether defendant was entitled to § 212(c) relief. (See id.) On August 19, 1997, the BIA denied defendant's appeal and motion to

reconsider. (Def. Brief Ex. O at 17-18.) Defendant was deported to Honduras less than three months later on November 17, 1997. (Def. Brief Ex. P at 8-9.)

On February 16, 2006, defendant was indicted for illegally reentering the United States in violation of 8 U.S.C. § 1326. By motion dated June 14, 2006, defendant seeks to dismiss the indictment by collaterally attacking his November 26, 1996 deportation order, which constitutes an element of the crime with which he is charged. The court held a "Copeland" hearing on July 13, 2006 in order to determine whether, had the IJ considered his application for section 212(c) relief in 1996, there is a reasonable probability that Najera-Trejo would have been granted such relief. Najera-Trejo testified on his own behalf and also called his mother and Pastor Velasquez as witnesses. The government called Special Agent C.J. Martinez of the Department of Homeland Security as a witness.

## DISCUSSION

Under 8 U.S.C. § 1326(d), an alien charged with illegal entry under 8 U.S.C. § 1326(a) may challenge the validity of the underlying deportation order upon which the illegal entry charge is based. See United States v. Lopez, 445 F.3d 90, 94 (2d Cir. 2006). This provision effectively codified the Supreme Court's holding in United States v. Mendoza-Lopez, 481 U.S. 828 (1987), that an alien has the right to collaterally challenge the validity of a deportation order when the order is being used to form the element of a criminal offense and the alien has been denied any possibility of judicial review. Id. at 838-39. In order to challenge the validity of a deportation order under § 1326(d), the defendant-alien must demonstrate that:

> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;

> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
>
> (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d). The defendant-alien must satisfy all three requirements in order to obtain dismissal of the indictment against him. United States v. Fernandez-Antonia, 278 F.3d 150, 157 (2d Cir. 2002).

    A.    Exhaustion

Defendant contends that his failure to appeal the IJ's § 212(c) ruling and, thus, exhaust administrative remedies should be excused because his counsel was ineffective for failing to file a timely appeal of the IJ's ruling. In response, the government argues that defendant failed to comply with the procedural requirements set forth Matter of Lozada, 19 I. & N. Dec. 637, 639 (B.I.A.), aff'd sub nom., Lozada v. INS, 857 F.2d 10 (1st Cir. 1988), to challenge the effectiveness of his counsel at the deportation hearing and, thus, he cannot demonstrate that he received ineffective assistance of counsel. The court concludes that defendant's failure to exhaust administrative remedies is excused because he has shown that any waiver of his right to appeal the IJ's § 212(c) ruling was not knowing and intelligent.

In United States v. Sosa, 387 F.3d 131 (2d Cir. 2004), the Second Circuit held that "the [administrative] exhaustion requirement [of Section 1326(d)(1)] must be excused where an alien's failure to exhaust results from an invalid waiver of the right to an administrative appeal." Id. at 136. The court went on to state that "[a] failure to exhaust administrative remedies bars collateral review of a deportation proceeding under Section 1326(d)(1), therefore, only where an alien's waiver of administrative review was knowing and intelligent." Id. The court held in Sosa that a waiver of administrative review is not knowing and intelligent, and therefore invalid,

8

where the defendant-alien was not informed by the IJ at his deportation hearing of his right to apply for § 212(c) relief or was erroneously informed that he was ineligible for such relief. Id. at 137. The court thus clarified that the exhaustion requirement must be excused for any alien who pleaded guilty to a deportable offense before April 24, 1996, was denied consideration for § 212(c) relief following the enactment of the 1996 amendments to the INA, and waived administrative review after being told by an IJ that he was ineligible for such relief as a matter of law.

In the instant case, the IJ explicitly rejected defendant's motion for discretionary relief pursuant to § 212(c). (Gov't Brief Ex. A at 30-31.) While the IJ noted that counsel could appeal his ruling to the BIA, he emphasized that the Attorney General would not reach a conclusion contrary to his own. (Id. at 31.) Thereafter, he spent a considerable amount of time explaining that defendant may instead be eligible for a waiver of inadmissibility under § 212(h) or for an adjustment of status under § 245. (Id. at 32-36.) Thus, the record clearly shows that the IJ erroneously informed defendant and his counsel that he was ineligible for relief under § 212(c). Indeed, counsel never raised the § 212(c) issue in the appeal of the IJ's decision or in the motion to reconsider the decision. Given that the IJ expressly informed defendant that he was ineligible for § 212(c) relief, the court concludes that defendant failed to make a knowing and intelligent decision to abandon his application for § 212(c) relief. Consequently, the court construes defendant's failure to appeal the IJ's § 212(c) ruling as an invalid waiver of his right to appeal the ruling.[2]

---

[2] Although the court relies on defendant's invalid waiver to excuse his failure to exhaust administrative remedies, the court notes that it finds the government's argument with respect to defendant's ineffective assistance of counsel claim unpersuasive. Defendant claims that his

9

Accordingly, the court excuses defendant's failure to exhaust administrative remedies and proceeds to the second requirement under § 1326(d). See Sosa, 387 F.3d at 137.

B.   Denial of the Opportunity for Judicial Review

Defendant argues that he was denied the opportunity for judicial review because he was deported within three months of the BIA's decision, he was misinformed about his eligibility for § 212(c) relief by the IJ, and he was prejudiced by ineffective assistance of counsel. In response, the government contends that defendant had sufficient opportunity for judicial review because the IJ encouraged defendant to appeal his § 212(c) ruling and defendant had enough time to file a habeas corpus petition once it was apparent that he had received ineffective assistance of counsel at his deportation proceeding. After reviewing the record, the court concludes that defendant has satisfied the second requirement under § 1326(d) by demonstrating that he had no realistic opportunity for judicial review.

Interpreting § 1326(d)(2), the Second Circuit has indicated that "judicial review" encompasses both direct appeal from a deportation order and judicial relief by way of habeas

---

counsel's failure to appeal the IJ's § 212(c) ruling constitutes ineffective assistance of counsel—thus, excusing him from the exhaustion requirement—because competent counsel would have raised the issue on appeal and defendant was clearly prejudiced by counsel's failure to raise the issue on appeal. The government argues that defendant's failure to comply with the procedural requirements set forth in Lozada preclude defendant from raising an ineffective assistance claim before this court. The court disagrees. In United States v. Perez, 330 F.3d 97 (2d Cir. 2003), the Second Circuit held that a defendant-alien "satisfied the exhaustion requirement by appealing the denial of his motion to reopen to the BIA," in spite of his failure "to explicitly state that he was claiming ineffective assistance of counsel." Id. at 101 & n.2. Thus, it appears that the procedural requirements set forth in Lozada are not applicable in the context of a defendant-alien's collateral challenge of a deportation order in a criminal proceeding. See United States v. Zheng, 409 F.3d 43, 47-48 (2d Cir. 2005) (distinguishing Perez, in part, "because neither compliance nor lack of compliance by the petitioner[] with the Lozada requirements was addressed in [the BIA] rulings.")

corpus. United States v. Copeland, 376 F.3d 61, 67-68 (2d Cir. 2004). The court stated that, where there was no statutory right to appeal a deportation order directly to a federal court, but habeas review was technically available, "judicial review will be deemed to have been denied if resort to a habeas proceeding was not realistically possible." Id. at 68 (emphasis added). The court specified that the opportunity for judicial review will be deemed to have been denied "where the interval between entry of the final deportation order and the physical deportation is too brief to afford a realistic possibility of filing a habeas petition." Id. In United States v. Calderon, 391 F.3d 370 (2d Cir. 2004), the court elaborated on its analysis in Copeland, finding that a defendant-alien had satisfied the section 1326(d)(2) requirement "that he demonstrate that he was deprived of the opportunity for judicial review because, although he had habeas review available to him, (a) he was mistakenly advised by the IJ to the contrary, and (b) his speedy deportation further limited his ability to seek review." Id. at 376. In Lopez, the Second Circuit clarified its holding in Calderon by explaining that "[w]hile the interval of time in which it is realistically possible for an alien seek judicial review may be quite short where the alien has not received misinformation, the analysis differs where the government affirmatively misleads an alien about the availability of relief." 445 F.3d at 99.

In the instant case, the IJ explicitly ruled that defendant was ineligible for § 212(c) relief due to the 1996 amendments to the INA. (Gov't Brief Ex. A at 31.) Moreover, as discussed earlier, the IJ explained his interpretation of the change in law to defendant and his counsel and then persuaded counsel to apply for other forms of relief. (Id. at 31-36.) In addition to this evidence showing that the IJ supplied misinformation to defendant, the record demonstrates that defendant was deported less than three months after the BIA denied defendant's appeal of the IJ's

11

decision on August 19, 1997. (Def. Brief Ex. P at 8-9.) The misinformation supplied by the IJ and the short interval between the final order of deportation and defendant's removal from the United States is sufficient for this court to conclude that defendant was deprived of the opportunity to seek judicial review. See Lopez, 445 F.3d at 93, 99-100 (holding that defendant-alien was deprived the opportunity of judicial review due to misinformation supplied by the IJ and the BIA, in spite of the fact that his removal occurred over one-and-half years after his final order of deportation was issued).

However, the court also notes that defendant's ineffective assistance of counsel claim provides further evidence in support of this court's conclusion that defendant was deprived of the opportunity to seek judicial review. In Perez, the Second Circuit held that an attorney's failure to file an application for § 212(c) relief constituted ineffective assistance of counsel and, thus, effectively deprived the defendant-alien of the opportunity for judicial review. 330 F.3d at 101-03. "[F]or an alien to prevail on a claim of ineffective assistance of counsel, he or she 'must show that his counsel's performance was so ineffective as to have impinged upon the fundamental fairness of the hearing in violation of the fifth amendment due process clause.'" Id. at 101. To establish fundamental unfairness, "an alien must 'allege facts sufficient to show 1) that competent counsel would have acted otherwise, and 2) that he was prejudiced by his counsel's deficient performance.'" Id. (quoting Rabiu v. I.N.S., 41 F.3d 879, 882 (internal quotation marks and citation omitted)).

Here, defendant's counsel suggested that she would appeal the IJ's § 212(c) ruling and failed to do so. (See Gov't Brief Ex. A at 29, 31.) Based on the record, there is simply no evidence that she communicated this decision to defendant or had any substantial communication

with defendant after his initial hearing. (See Hr'g Tr. 54.) Counsel's failure to file the section 212(c) application after suggesting that she would at the deportation hearing, and without later informing her client otherwise, falls below the level of performance expected of competent counsel. See id. at 102. Defendant has also shown that he was prejudiced by counsel's ineffective assistance by demonstrating that he was eligible for § 212(c) relief and that, as explained in detail below, there was a reasonable probability that, but for the IJ's errors, he would have been granted § 212(c) relief. See id. at 102-03. Defendant has therefore demonstrated that he has received ineffective assistance of counsel, depriving him of the opportunity for judicial review.

Given that defendant has established that he received ineffective assistance of counsel, in addition to showing that the IJ supplied misinformation and that there was too short a period to seek judicial review before his removal, the court concludes that defendant has more than adequately demonstrated that he was denied the opportunity to seek judicial review.

C.  Fundamental Unfairness

Defendant also contends that his deportation proceeding was fundamentally unfair due to procedural errors and prejudice resulting from the errors. The government argues that defendant cannot demonstrate that he was prejudiced by any error at his deportation hearing because defendant was convicted of eight criminal charges at the time of his deportation and continued to exhibit violent tendencies while he was incarcerated. After considering the facts and equities as they existed at the time of defendant's deportation proceeding, the court concludes that defendant has established that, but for the procedural errors committed at his deportation hearing, there was a reasonable probability he would have received § 212(c) relief.

13

In Copeland, the Second Circuit stated explicitly, with respect to § 1326(d)(3)'s "fundamental unfairness" requirement, that an IJ's "failure to advise a potential deportee of a right to seek Section 212(c) relief can, if prejudicial, be fundamentally unfair within the meaning of Section 1326(d)(3)." 376 F.3d at 71. Considering the special duties IJs have with respect to aliens, the court ruled that an IJ's statement misleading an alien into believing that no relief exists as a matter of law is fundamental procedural error. Id. In Perez, the Second Circuit held that ineffective assistance of counsel constitutes a procedural error in the context of § 1326(d)(3). 330 F.3d at 104. In Copeland, the Second Circuit adopted the standard for establishing prejudice that the Supreme Court had enunciated in Strickland v. Washington, 466 U.S. 668 (1984). Prejudice is established under that standard "where there is a reasonable probability that, but for the IJ's unprofessional errors, the alien would have been granted Section 212(c) relief." 376 F.3d at 73. The Copeland court stated that the determination of prejudice in the section 1326(d)(3) context is "akin to a trial within a trial" requiring the district court to "obtain all of the facts relevant to the particular alien and then apply standards established under Section 212(c) to those facts, taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief." Id. at 73-74.

Specifically, the Second Circuit directed district courts, in cases involving collateral attacks on deportation orders, to hold a hearing much like the § 212(c) hearing that the IJ should have held initially and to balance "'the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether the granting of section 212(c) relief appears in the bests interests of this country.'" Id. at 74 (quoting Matter of Marin, 16 I. & N. Dec. 581, 584 (BIA 1978)). The

14

Second Circuit has made clear that "what is at stake in the illegal reentry context is not the restoration of the defendant's deprived opportunity to apply for § 212(c) relief. Rather, in the illegal reentry context, the defendant is asking the court to dismiss the indictment against him . . . ." Edwards v. INS, 393 F.3d 299, 311 (2d Cir. 2004). The court went on to state that "the courts must necessarily play the role of prognosticator, and divine whether, had the error not occurred, the defendant would likely have obtained immigration relief." Id. The court has further clarified that, in determining whether the defendant-alien suffered prejudice as a result of the fundamental procedural error in the removal proceeding, "'[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." United States v. Scott, 394 F.3d 111, 118 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 694). In Scott, the court indicated that when considering whether a defendant in an illegal reentry prosecution suffered prejudice as a result of the IJ's error, the court must limit its consideration to the facts and equities as they existed at the time of the deportation proceeding when the procedural error occurred and may not consider "ex post data." Id. The court stated that, "in assessing whether the defendant-alien had a reasonable probability of not being deported at his proceeding . . ., the district court should reconstruct events as they existed at the time of the disputed deportation proceeding, without considering future occurrences." Id. at 119.

The considerations, or equities, that IJs balance when considering an application for § 212(c) relief, are well established. Adverse factors include: (1) the nature and circumstances of the exclusion ground at issue; (2) other immigration law violations; (3) the alien's criminal record; and (4) evidence indicative of an alien's undesirability as a permanent resident. Favorable factors include: (1) family ties to the United States; (2) many years of residency in the

15

United States; (3) hardship to the alien and his family upon deportation; (4) United States military service; (5) employment history; (6) community service; (7) property or business ties; (8) evidence attesting to good character; and, in the case of a convicted criminal, (9) proof of genuine rehabilitation. Marin, 16 I. & N. Dec. at 584-85; Lovell v. INS, 52 F.3d 458, 461 (2d Cir. 1995).

The record establishes that two procedural errors occurred during defendant's deportation proceedings. First, the IJ erred by failing to advise defendant at his deportation hearing that he had the right to apply for § 212(c) relief. Second, defendant's counsel was ineffective for failing to appeal the IJ's § 212(c) ruling. Thus, the court will proceed to balance the equities as they existed at the time of defendant's deportation hearing in October 1996.

With respect to the adverse considerations, the court first considers the exclusion ground at issue. Defendant's deportation order was issued on the basis of his conviction for an aggravated felony. (Gov't Brief Ex. A at 27.) In 1994, at the age of sixteen, defendant pled guilty to eight criminal charges, including one count of first degree robbery. (Id. at 197-226.) At the Copeland hearing, defendant testified that he was under the influence of marijuana when he and his friend at the time, Julio, decided to steal a car to go for a joy ride. (Hr'g Tr. 39-40.) Defendant testified that he used a stapler to hit the driver of the vehicle, while Julio got into the driver's seat. (Id. at 40.) Defendant pled guilty to the charges against him in 1995 and was sentenced to a term of incarceration of two to six years. (Gov't Brief Ex. A at 99.) Because the first degree robbery offense was of a violent nature, defendant's conviction constitutes a "serious" offense as generally understood in the § 212(c) context. At the time of his deportation hearing, defendant did not have a history of violating the immigrations laws, nor did he have a

16

prior criminal history. With respect to the final adverse factor, the government contends that defendant's behavior in prison is evidence indicative of defendant's undesirability as a permanent resident. At the time of his deportation hearing, on October 10, 1996, however, defendant had merely been cited for disobeying a direct order, fighting, and creating a disturbance. (See Gov't Hr'g Ex. 1.) Given that the record provides few details of the disciplinary infractions, the court cannot conclude that those incidents were at all serious or in any way reflected defendant's undesirability as a permanent resident. Thus, the court determines that the only adverse factor weighing against defendant at the time of his deportation hearing was his conviction for an aggravated felony.

Despite the seriousness of defendant's conviction for first degree robbery, defendant also had considerable favorable equities at the time of his deportation proceeding. First, he had substantial family ties to the United States. His mother, stepfather, brother, half-sister, and half-brother all lived in Brooklyn. (Hr'g Tr. 15-16.) In addition, his aunt and uncle and their respective families also lived in Brooklyn. (Id. at 17.) While it is unclear whether defendant had contact with his birth father, there is also evidence that his birth father lived in Florida at the time. (Id. at 18.) Second, defendant had entered the country legally and lived in the United States since the age of eleven. (See id. at 15, 26.) While he had only lived in the country for seven-and-a-half years, he had lived in Brooklyn for a substantial portion of his childhood at the time of his deportation hearing. Third, there is evidence that defendant's family would have testified, had they had the opportunity, that they would suffer hardship upon his deportation. At the hearing before this court, defendant's mother testified that she had brought defendant and his brother to the United States to reunite her family and that she and her children missed

defendant's presence in the family. (Id. at 16, 23-25.) Fourth, even though he was deported at a young age, defendant has some work history weighing in his favor. As described in detail earlier, defendant worked regularly at an after-school job as a delivery boy for a grocery store to help his family with their expenses. (Id. at 20, 26.) Fifth, there is considerable evidence of defendant's participation in community service activities. Defendant, on his accord, volunteered at the Carismatico Church by assisting with the construction of the church, participating in youth retreats, and attending services three times per week. (Id. at 3-7.) In addition, defendant spent two years in the Boy Scouts, attending troop meetings, going on camping trips, and even receiving an award for rescuing a fellow troop member who got lost on a camping trip. (Id. at 22, 35-36.) Finally, defendant has presented some evidence of rehabilitation during his incarceration at Ulster Correctional Facility immediately prior to his deportation proceeding in 1996, attesting to his participation in GED classes and various other programs at the facility. (Id. at 45-46.)

Although defendant's exclusion ground is serious, it is clear that he also had unusual or outstanding equities in his favor in October 1996. In addition to the duration of his lawful residency in the United States and his family ties, his employment and his extensive community service activities at his young age and the evidence, albeit limited, of his rehabilitation make a strong showing in favor of § 212(c) relief. Thus, the court determines that defendant has demonstrated a reasonable probability of receiving § 212(c) relief, thereby demonstrating that he was prejudiced by the procedural errors that occurred at his deportation hearing.

The court concludes that defendant has satisfied all three requirements under § 1326(d) and has therefore demonstrated that the underlying deportation order violated his due process

rights. As a result, defendant's prior deportation cannot be the basis for the element of prior deportation in the illegal reentry charge. The court must grant defendant's motion and dismiss the indictment charging defendant with illegal reentry in violation of § 1326(a).

## CONCLUSION

For the foregoing reasons, the court concludes that defendant has demonstrated that the underlying deportation order violated his due process rights and, therefore, cannot be the basis for the element of prior deportation in the illegal reentry charge. Accordingly, defendant's motion is granted, and the indictment is dismissed. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

_____
Allyne R. Ross
United States District Judge

Dated: July 31, 2006
Brooklyn, New York

SERVICE LIST:

       <u>Attorney for the United States</u>
       James Patrick Loonam
       United States Attorney's Office
       147 Pierrepont Street
       Brooklyn, NY 11201


       <u>Attorney for Defendant</u>
       Heidi C. Cesare
       Federal Defenders of New York, Inc.
       16 Court Street, 3rd Floor
       Brooklyn, NY 11201-4859